UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -:
DORU TSAGANEA,                        :    06 Civ. 15366 (DAB)(JCF)
                                      :
              Plaintiff,              :         REPORT AND
                                      :         RECOMMENDATION
      - against -                     :
                                      :
THE CITY UNIVERSITY OF NEW YORK       :
and BARUCH COLLEGE,                   :
                                      :
              Defendants.             :
- - - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE DEBORAH A BATTS, U.S.D.J.:

        Doru Tsaganea brings this employment discrimination action pro
se pursuant to Title VII of the Civil Rights Act of 1964 ("Title
VII"), 42 U.S.C. § 2000e et seq., and the New York Human Rights Law
("NYHRL"), N.Y. Exec. Law § 296, alleging that Baruch College, a
senior college of the City University of New York ("CUNY"),
discriminated against him on the basis of his national origin and
religion and then retaliated against him when he complained of such
treatment.[1]  The defendants now move for summary judgment pursuant
to Rule 56 of the Federal Rules of Civil Procedure.  For the
reasons set forth below, I recommend that the motion be granted in
part and denied in part.

---

        [1] Originally, the plaintiff also alleged age discrimination,
but this claim was dismissed pursuant to my Report and
Recommendation dated August 28, 2008 and the Order adopting it
dated October 8, 2008.  Tsaganea v. City University of New York,
No. 06 Civ. 15366, 2008 WL 4054426 (S.D.N.Y. Aug. 28, 2008).

1

Background[2]

Doru Tsaganea was born in Romania to Greek and Armenian parents and is an Eastern Orthodox Christian. (Amendment to State Division of Human Rights Complaint dated April 22, 2003 ("First Admin. Compl."), attached as Exh. 1 to Complaint ("Compl."), ¶ 1). After emigrating to the United States in 1984, he became a naturalized American citizen. (Affidavit of Doru Tsaganea dated July 2, 2007 ("Tsaganea 7/2/07 Aff.") at 5, 8). Dr. Tsaganea holds doctoral degrees in Political Science and Economics. (Compl. at 4).

From January 1998 to May 2002, Dr. Tsaganea was an Adjunct Assistant Professor at Baruch College. (First Admin. Compl., ¶ 3). When this dispute arose, he had been promoted to Substitute Assistant Professor in the Political Science Department (the "Department"), a position that he held from September 2002 through August 2003.[3] (First Admin. Compl., ¶¶ 2-3; Plaintiff's Responses to Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Pl. Response") at 29).

In December 2002, the plaintiff applied for a tenure-track

---

[2] The factual background of this case is also set forth in my earlier Report and Recommendation. Tsaganea, 2007 WL 2907280.

[3] Substitute professorships are full-time positions that may not last for more than four semesters. (Letter of Doru Tsaganea dated July 10, 2006 ("Tsaganea 7/10/06 Letter"), attached as Exh. 4 to First Admin. Compl., at 4-5; Defendants' Local Civil Rule 56.1 Statement ("Rule 56.1 Statement"), ¶¶ 14-15).

2

position as an Assistant Professor in the Department. (First Admin. Compl., ¶ 4). The selection committee did not interview him for the opening, a decision CUNY claims was based on the "unusually weak" letters of recommendation that he submitted and his "sparse" history of publication. (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Memo.") at 7-8). The Selection Committee interviewed five candidates and offered the position to Dr. Norrin Ripsman. (Declaration of Thomas Halper dated May 28, 2009 ("Halper Decl."), ¶¶ 20, 24). Dr. Ripsman ultimately declined the offer, and the search remained open until 2004, when Dr. Dov Waxman was hired. (Halper Decl., ¶ 24; Def. Memo. at 9). Dr. Tsaganea notes that the majority of the selection committee members and its chairperson, as well as Dr. Waxman and Dr. Ripsman, are Jewish. (Tsaganea 7/10/06 Letter at 12; Pl. Response at 4, 20, 51-53). The defendants respond that between their offers to Dr. Ripsman and Dr. Waxman, they offered the position to a candidate of Indian origin. (Rule 56.1 Statement, ¶ 27).[4]

---

[4] Although both parties are required to submit a Local Rule 56.1 Statement of Facts, only the defendants did so in this case. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." Jessamy v. City of New Rochelle, New York, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003). However, given the plaintiff's pro se status, I will only treat the defendants' facts as admitted for the purpose of this motion where Dr. Tsaganea has presented no specific contradictory evidence. See Wagner v. County of Nassau, No. 07 CV 4042, 2009 WL 2824699, at *2

In February 2003, Dr. Tsaganea complained to his union representative and to CUNY's Chancellor, Matthew Goldstein, about not being hired. (First Admin. Compl., ¶ 9; Letter of Doru Tsaganea dated Feb. 17, 2003 (Tsaganea "2/17/03 Letter"), attached as Exh. 14 to Declaration of Clement J. Colucci dated May 29, 2009 ("Colucci Decl."); Rule 56.1 Statement, ¶¶ 28-31). In his letter to Chancellor Goldstein, which was dated February 17, 2003 (the "February Letter"), Dr. Tsaganea wrote that he believed the decision not to interview him for the position "constitute[d] a case of flagrant job discrimination." (Tsaganea 2/17/03 Letter at 2). In response to this letter, Baruch College's Affirmative Action Officer commenced an internal investigation. (Report of Carmen Pedrogo dated March 21, 2003 ("Pedrogo Report"), attached as Exh. 17 to Colucci Decl.). Ultimately, the officer found "no evidence of any form of discrimination." (Declaration of Carmen Pedrogo dated May 28, 2009 ("Pedrogo Decl."), ¶ 3).

Dr. Tsaganea filed a complaint with the New York State Division of Human Rights (the "SDHR") on April 8, 2003 and amended it on April 22, 2003. He alleged that Baruch College discriminated against him on the basis of his national origin, age, and religion[5]

---

n.2 (E.D.N.Y. Aug. 28, 2009).

[5] Dr. Tsaganea added the religious discrimination claim after learning that the tenure-track position was offered to Dr. Ripsman, whom he knew to be Jewish. (Pl. Response at 27-28).

by denying him an interview for the full-time professor position. (First Admin. Compl., ¶¶ 8, 10). On July 20, 2005, the SDHR determined, after an investigation, that there was no probable cause to believe that the defendants had discriminated against the plaintiff. (Determination and Order After Investigation dated July 20, 2005 ("First Admin. Determination"), attached as Exh. 3 to Compl., at 1). The SDHR concluded that CUNY had "articulated legitimate, non-discriminatory academic and business reasons" for declining to interview him. (First Admin. Determination at 3). The SDHR also referred the complaint to the Equal Employment Opportunity Commission (the "EEOC"), which adopted the SDHR's findings. (EEOC Notice of Charge of Discrimination dated April 8, 2003, attached as Exh. B to Declaration of Clement J. Colucci dated March 31, 2008 ("Colucci 3/31/08 Decl."); Affidavit of Holly M. Woodyard dated March 27, 2008 ("Woodyard 3/27/08 Aff."), attached as Exh. C to Colucci 3/31/08 Decl.; EEOC Charge Detail Inquiry, attached as Exh. A to Woodyard 3/27/08 Aff.).

In May 2003, due to CUNY's failure to fill the available tenure-track position, the Department had an opening for a Substitute Assistant Professor for the 2003-2004 school year. (Halper Decl., ¶¶ 25, 31). On May 12, 2003, the plaintiff wrote to Dr. Thomas Halper, the Department's Chairperson, asking to be re-appointed to this position for a second year. (Rule 56.1 Statement, ¶ 43; Letter of Doru Tsaganea dated May 12, 2003

("Tsaganea 5/12/03 Letter"), attached as Exh. 20 to Colucci Decl.). A week later, the plaintiff sent Dr. Halper a second letter informing him about the discrimination claim he had filed with the SDHR and the EEOC ("Tsaganea 5/19/03 Letter"). (Rule 56.1 Statement, ¶ 44; Letter of Doru Tsaganea dated May 19, 2003, attached as Exh. 21 to Colucci Decl.). The Department rejected the plaintiff and instead hired Dr. Prosper Bernard to fill the substitute position. (Rule 56.1 Statement, ¶ 39).

Dr. Tsaganea then filed the instant action on December 21, 2006. The defendants now move for summary judgment.

Discussion

    A.   Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002); Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co., 189 F.3d 208, 214 (2d Cir. 1999). The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The opposing party then must come forward with "specific facts showing a genuine issue for trial."

Fed. R. Civ. P. 56(e).  Where the non-movant fails to make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. Celotex, 477 U.S. at 322.

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995).  But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative.  Anderson, 477 U.S. at 249-50 (citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288 (1968)).

Where a litigant is pro se, his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest."  McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.

7

1999) (quoting <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994)). Nevertheless, proceeding <u>pro</u> <u>se</u> does not relieve a litigant from the usual requirements of summary judgment, and a <u>pro</u> <u>se</u> party's "'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." <u>Lee v. Coughlin</u>, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting <u>Carey v. Crescenzi</u>, 923 F.2d 18, 21 (2d Cir. 1991)); <u>accord</u> <u>Gittens v. Garlocks Sealing Technologies</u>, 19 F. Supp. 2d 104, 110 (W.D.N.Y. 1998).

In addition, the court's review of the record is limited to facts that would be admissible at trial. Rule 56(e) states that affidavits in support of or against summary judgment shall "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(e). Accordingly, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir. 1997).

B.    <u>Discrimination Claim</u>

Claims of discrimination under Title VII are analyzed in accordance with the three-part framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). This same framework applies to employment discrimination claims under the NYHRL. <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 n.1 (2d Cir. 2000) ("Our consideration of claims brought under the state and city human rights laws parallels the analysis used in

Title VII claims."). Therefore, I analyze both sets of claims together.

In the first stage of the McDonnell Douglas analysis, the plaintiff must establish a prima facie case of discrimination by showing that (1) he is within a protected group, (2) he applied and was qualified for the job at issue, (3) he was subjected to an adverse employment action, and (4) that action occurred under circumstances giving rise to an inference of discrimination. McDonnell Douglas, 411 U.S. at 802; Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005). The "evidence necessary to satisfy this initial burden" is "minimal." Zimmermann v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). The defendants concede that Dr. Tsaganea meets the first three of these criteria. (Def. Memo. at 16). However, the parties dispute whether the facts support an inference the selection committee declined to interview the plaintiff based on discriminatory reasons.

The defendants argue that because Dr. Tsaganea does not claim that anyone in the Department displayed racial or religious animus toward him,[6] there is no basis for inferring discriminatory animus.

---

[6] The plaintiff originally alleged that Dr. Halper demonstrated discriminatory animus by advising him against pursuing a teaching career. (Pedrogo Report at 2). However, Dr. Tsaganea downplayed this incident in his deposition, characterizing Dr. Halper's derogatory comments as "indirect" and explaining that they mostly focused on his qualifications for a professorship. (Deposition of Doru Tsaganea dated March 26, 2009 at 49-52, attached to Colucci Decl.). The plaintiff has since recanted the allegation, declaring that no person from Baruch College ever

However, plaintiffs alleging discrimination "more often than not must depend on the cumulative weight of circumstantial evidence to make out a prima facie case." Tarshis v. Riese Organization, 211 F.3d 30, 35-36 (2d Cir. 2000). For example, a plaintiff may trigger an inference of discrimination by showing that the employer "treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island Rail Road, 230 F.3d 34, 39 (2d Cir. 2000). In fact, a plaintiff can establish a prima facie case when he shows that a position for which he was rejected remained open and was later filled by an applicant outside of his protected class. Quarantino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1998); Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997); Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37-38 (2d Cir. 1994).

Here, Dr. Tsaganea alleges that he was treated less favorably than similarly situated Jewish candidates. (First Admin. Compl., ¶¶ 1, 8; Pl. Response at 4, 27-28, 50-53). He notes that the position for which he applied remained open and then was offered to applicants of different nationalities and religions from his. He further observes that the majority of the selection committee members were Jewish, as were Dr. Ripsman and Dr. Waxman. (Pl. Response at 4, 27-28, 50-53). Therefore, the plaintiff has

---

"insult[ed him] in any manner for [his] national origin or religion." (Pl. Response at 49, 49 n.42).

surpassed the low threshold needed to make out a prima facie case under McDonnell Douglas.

Accordingly, the burden shifts to the defendants to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993) (quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981)). Despite the shift of the burden of production, "[t]he ultimate burden of persuading the trier of fact that the defendant[s] intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253; Hicks, 509 U.S. at 507.

The defendants assert that Dr. Tsaganea was far less qualified than the candidates who were interviewed for the tenure-track position. They point to his purportedly weak letters of recommendation and his limited record of publications in journals that they view as obscure. (Def. Memo. at 7-8, 17; Halper Decl., ¶¶ 2, 15, 21-23).

The plaintiff concedes that his letters of recommendation were "unusually weak." (Pl. Response at 15). The first of the plaintiff's two letters of recommendation is from Professor Henry Wasser, the president of CUNY's Graduate School. Despite the plaintiff's concession, Professor Wasser's letter appears to be positive. It concludes, for instance, with Professor Wasser's assessment that Dr. Tsaganea is "a most highly qualified candidate

who has my highest recommendation." (Letter of Henry Wasser dated Dec. 18, 2002, attached to Application of Doru Tsaganea dated Dec. 27, 2002 ("Tsaganea Application"), attached as Exh. 13 to Colucci Decl.). In fact, the defendants attempt to undermine Professor Wasser's letter by noting that the professor is not a specialist in international relations.

The plaintiff's second letter was submitted by Professor Lentner. Although this letter is by no means negative, it pales in comparison to a letter Professor Lentner wrote on behalf of another candidate, Jennifer Holdaway. On behalf of Dr. Holdaway, Professor Lentner wrote, "In sum, it is without reservation and with considerable enthusiasm that I recommend Jennifer Holdaway for your position." (Letter of Howard H. Lentner dated Dec. 4, 2002, attached to Application of Jennifer Holdaway dated Jan. 10, 2003 ("Holdaway Application"), attached as Exh. 8 to Colluci Decl., at 2). By contrast, Dr. Lentner concluded his letter about Dr. Tsaganea by saying only, "I hope you will give him your serious consideration." (Letter of Howard H. Lentner dated Dec. 24, 2002, attached to Tsaganea Application, at 2).[7]

---

[7] The plaintiff's application also included an e-mail to Dr. Halper from Professor Mark Sheingorn, who was on Dr. Tsaganea's dissertation committee. Although Professor Sheingorn characterizes his comments as a "letter of recommendation" (E-mail of Mark Sheingorn dated Dec. 23, 2002 ("Sheingorn E-mail"), attached to Tsaganea Application), Dr. Tsaganea does not. In his e-mail, Professor Sheingorn expressed his shock over the "hostile line of questioning" with which the plaintiff was confronted at his dissertation defense. (Sheingorn E-mail). The defendants simply

     The defendants assert that the five candidates interviewed for
the assistant professor position had more impressive records of
publication that the plaintiff. (Def. Memo. at 7-8). Dr. Tsaganea
had published two papers in professional journals: a 2002 article
in the international scientific journal Kybernetes, and a 1997
article in Romanian for the journal Polis. (Tsaganea Application).
Additionally, he had written a paper covering Romania's admission
to NATO and presented thirteen papers or lectures at conferences.
(Tsaganea Application). Dr. Holdaway, on the other hand, had co-
authored a book chapter as well as a journal article, written four
journal articles and published two translations, despite receiving
her Ph.D. ten years later than Dr. Tsaganea. (Holdaway
Application). Another applicant, Dr. Elizabeth Wishnick, had
earned her Ph.D. the same year as Dr. Tsaganea and had completed
six book chapters, five published book reviews, and twelve journal
articles. (Application of Elizabeth Wishnick dated Dec. 18, 2002
("Wishnick Application"), attached as Exh. 11 to Colucci Decl.).
Dr. Michael Mousseau had published a book chapter and eight journal
articles and had presented fourteen papers at conferences.
(Application of Michael Mousseau dated Jan. 13, 2003 ("Mousseau
Application"), attached as Exh. 9 to Colucci Decl.). Dr. Ripsman
had written one book, co-edited another, published or co-published

---

point out that Professor Sheingorn is a mathematician, not a
professor of international relations. (Def. Memo. at 8).

three book chapters and eleven articles, and presented at seventeen conferences.  (Application of Norrin Ripsman dated Dec. 3, 2002 ("Ripsman Application"), attached as Exh. 10 to Colucci Decl.). Lastly, a graduating Ph.D. candidate, Zhiqun Zhu, had published a book review, one book chapter, and six journal articles and had presented eight conference papers.  (Application of Zhiqun Zhu dated Nov. 22, 2002 ("Zhu Application"), attached as Exh. 12 to Colucci Decl.).

When the employer provides evidence of legitimate nondiscriminatory reasons for its action, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253.  A plaintiff opposing a summary judgment motion "must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false," Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir. 1994), and "that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trustees of Columbia University in the City of New York, 131 F.3d 305, 312 (2d Cir. 1997).

Dr. Tsaganea attempts to show that the defendants' hiring criteria were pretextual by arguing that the selection committee departed from the requirements for assistant professor appointments

14

as set forth by CUNY.  Indeed, if an employer deviates from usual hiring practice or stated policies, this may support a finding that the employment decision was more likely than not based on discrimination.  See id. at 313.  To support this argument, the plaintiff cites CUNY's Bylaws as well as its Statement of the Board of Higher Education on Academic Personnel Practice ("Academic Personnel Policy"), a policy statement issued in 1975.  (Pl. Response at 36-41; Bylaws of the Board of Trustees of the City of New York dated Dec. 1, 1999 ("CUNY Bylaws"), attached as Exh. 3 to Pl. Response; Academic Personnel Policy, dated Sept. 22, 1975, attached as Exh. 4 to Pl. Response).

     The Bylaws require that a candidate for an assistant professorship possess a Ph.D. and "demonstrate [] satisfactory qualities of personality and character, evidence of significant success as a teacher, interest in productive scholarship or creative achievement and willingness to cooperate with others for the good of the institution."  (CUNY Bylaws at 11.7(B)(2)).  Similarly, the Academic Personnel Policy sets forth the following criteria for promotion to an assistant professor position: (1) teaching effectiveness; (2) scholarly and professional growth, consisting of achievement or potential shown through, for example, "evidence of research in progress leading toward scholarly publication" or "publication in professional journals;" (3) service to the institution; and (4) service to the public.  (Academic

Personnel Policy at 6-7, 9).

The plaintiff's assertion that the selection committee strayed from these criteria is untenable. The defendants have shown that the committee considered the candidates' scholarly publications as well as their teaching abilities and character traits, criteria that the Bylaws and Policy emphasize. The latter criteria are addressed by each candidate's letters of recommendation. (Letter of Xiaobo Lu dated Oct. 7, 2002, attached to Holdaway Application, at 1. ("Jennifer is an excellent teacher. . . . Jennifer is also a very mature and balanced person."); Undated Letter of Stuart A. Bremer, attached to Mousseau Application, at 2 ("[Michael] is a conscientious and dedicated teacher . . . . Michael is a mature and responsible individual who gets along well with others."); Letter of Rudra Sil dated Aug. 9, 2002, attached to Ripsman Application, at 2. ("Ripsman will make a first-rate addition to any department, as a researcher, teacher, and colleague."); Letter of Richard M. Pious dated December 4, 2001, attached to Wishnick Application ("Elizabeth is a delightful person and a splendid colleague. . . . She worked hard . . . for her students while at Barnard [and] received fine course evaluations. . . .); Letter of Charles W. Kegley, Jr. dated Aug. 1, 2002, attached to Zhu Application ("I have been very impressed by [Mr. Zhu's] intellectual capability and professional maturity. . . . It is not surprising to me that students' evaluations indicate he is one of

16

the best-rated professors/instructors in the department.")).

Although it may have put more emphasis on some criteria than on others, the selection committee does not appear to have departed from the criteria in CUNY's Bylaws and Policy. If an employer decides to weigh some qualifications more heavily when selecting candidates, it is inappropriate for a court to question this value judgment absent some plausible showing that the employer's stated reasons are a pretext for discrimination. <u>Scaria v. Rubin</u>, 117 F.3d 652, 654-55 (2d Cir. 1997); <u>Byrnie v. Town of Cromwell Board of Education</u>, 243 F.3d 93, 103 (2d Cir. 2001) (internal quotations omitted) ("[T]he court must respect the employer's unfettered discretion to choose among qualified candidates."). It is not the role of a court to "act as a super personnel department that second guesses employers' business judgments." <u>Simms v. Oklahoma ex rel. Department of Mental Health and Substance Abuse Services</u>, 165 F.3d 1321, 1330 (10th Cir. 1999); <u>accord</u> <u>Dale v. Chicago Tribune Co.</u>, 797 F.2d 458, 464 (7th Cir. 1986).

The plaintiff also attempts to show pretext by focusing on the difference between his qualifications and those of Mr. Zhu, the candidate who did not have a Ph.D. at the time of his application. (Pl. Response at 37, 51). Dr. Tsaganea posits that because Mr. Zhu was so unqualified for the professorship he was set up as a straw man so that Dr. Ripsman could be selected. (Pl. Response at 51). However, as the defendants point out, Mr. Zhu was to receive

17

his Ph.D. in 2003, the year the professorship was to start, and thus he would meet CUNY's requirements. (Halper Decl., ¶ 22; Zhu Application). Additionally, Mr. Zhu had many more publications than Dr. Tsaganea.

Finally, the plaintiff relies on purported statistical evidence to support his theory that the selection process was rigged to hire a Jewish candidate. (Pl. Response at 52-53). To be sure, a plaintiff may use employment statistics to show a pattern of discrimination. McDonnell Douglas, 411 U.S. at 805 ("[s]tatistics as to [the defendant's employment policy and practice may be helpful to a determination of whether 'the defendant]'s refusal to rehire [the plaintiff] . . . conformed to a general pattern of discrimination . . . .'"). However, Dr. Tsaganea's statistics do not support his theory that CUNY conspired to hire only Jewish candidates. He cites data from 2006 from the American Jewish Committee to claim that "the probability of hiring a Jewish person under non-biased condition[s] is . . . 1.78%." (Pl. Response at 52). That figure, however, merely represents the percentage of Jewish persons in the population of the United States. Therefore, the analysis is incomplete, as it does not take into account the number of Jewish persons on one hand and Eastern Orthodox or Romanian persons on the other who hold Ph.D.s from qualified universities. Simplistic data showing the percentage population of an ethnic group does not paint a picture of disparate

18

treatment when qualifications for hiring are not equally shared among the population at large. <u>Mayor of City of Philadelphia v. Educational Equality League</u>, 415 U.S. 605, 619-21 (1974). Also, because of the miniscule sample size, the statistics proffered here likely have no significance even if the analysis had controlled for qualifications. <u>Id.</u> at 620-21 (rejecting "simplistic percentage comparisons" as indicia of discrimination due in part to small sample size); <u>International Brotherhood of Teamsters</u>, 431 U.S. at 339 n.20 (1977) (small sample size may detract from probative force of statistics).

Therefore, nowhere in Dr. Tsaganea's papers does he present adequate evidence to show that CUNY's selection of candidates with more numerous and prestigious publications as well as more positive recommendations was a pretext for discrimination. Because Dr. Tsaganea's arguments are conclusory and could not lead a reasonable trier of fact to rule in his favor, I recommend granting the defendants' motion for summary judgment with respect to the plaintiff's claims of discrimination.

C.    <u>Retaliation Claim</u>

The plaintiff also asserts that Baruch College retaliated against him by declining to renew his substitute teaching contract after he voiced objection to the tenure-track hiring process. As discussed above, Dr. Tsaganea wrote a letter of complaint to the Chancellor of CUNY in February 2003 after learning the he had been

denied an interview for the assistant professor position.
(Tsaganea 2/17/03 Letter at 1-2).  In the February Letter he
alleged that "the decision not to interview him constitutes a case
of flagrant job discrimination." (Tsaganea 2/17/03 Letter at 2).
In addition, he characterized the decision as "deeply immoral,"
"un-American," and "illegal."  (Tsaganea 2/17/03 Letter at 4).

Subsequently, CUNY's Vice Chancellor for Faculty and Staff
Relations, Brenda Richardson, instructed CUNY's Affirmative Action
Officer, Carmen Pedrogo, to investigate Dr. Tsaganea's claim of
discrimination.  (Pedrogo Decl., ¶ 1, 3).  After interviewing
members of the selection committee and analyzing the applications
of the other candidates, Ms. Pedrogo found no evidence of
discrimination.  (Pedrogo Report at 6-7).

In March 2008, Dr. Tsaganea received a handwritten note from
Dr. Halper stating:

> Doru -
> [Y]ou'd asked [] about teaching here
> next fall.  As I said when we last
> talked, a week or so ago, we won't
> be needing many [International
> Relations] adjuncts, and so we won't
> be using your services
>
> Tom Halper

(First Admin. Compl., ¶ 9; Rule 56.1 Statement, ¶ 40; Note of Dr.
Thomas Halper, attached as Exh. 16 to Colucci Decl. (the "March
Note")).

In April 2003, the plaintiff filed his complaint of

discrimination with the SDHR. When Dr. Ripsman declined the tenure-track position, an opening became available for a substitute professor position. (Halper Decl., ¶¶ 24-25). Upon learning of the opening, Dr. Tsaganea sent two letters to Dr. Halper in May 2003 requesting a continuation of his current position. (Tsaganea 5/12/03 Letter; Tsaganea 5/19/03 Letter). In the second letter, he explained that he had filed formal grievances with the SDHR and the EEOC and suggested that Dr. Halper's failure to allow him to continue as a substitute professor could constitute retaliation in violation of the New York Human Rights Law. (Tsaganea 5/19/03 Letter). Notwithstanding this warning, the Department hired Dr. Bernard in the substitute position. (Halper Decl., ¶ 31). Dr. Tsaganea asserts that Dr. Bernard was not comparably qualified to teach International Relations courses. (Pl. Response at 30).

Section 704(a) of Title VII provides in pertinent part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice by this sub chapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Likewise, New York Executive Law § 296(1)(e) makes it unlawful for "any employer . . . to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices

21

forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." Notably, "[t]o establish that his activity is protected under Title VII, a plaintiff need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." Sumner v. United States Postal Service, 889 F.2d 203, 209 (2d Cir. 1990); accord McMenemy v. City of Rochester, 241 F.3d 279, 283 (2d Cir. 2001).

In order to defeat a motion for summary judgment regarding a retaliation claim, a plaintiff must set forth

> evidence sufficient to permit a rational trier of fact to find [1] that [he] "engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."

Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001) (quoting Sumner, 899 F.2d at 208-09). Just as with the McDonnell Douglas prima facie test, "[t]he plaintiff's burden at this stage is slight; [he] may establish a prima facie case with de minimis evidence." Shepard v. Frontier Communications Services, Inc., 92 F. Supp. 2d 279, 291 (S.D.N.Y. 2000); accord Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997). Here, the plaintiff alleges that his substitute teaching contract was not renewed in the summer of 2003 as a result of his informal and formal

22

complaints about being passed over for the tenure-track position. Specifically, the plaintiff claims that the February Letter to Chancellor Goldstein and his filing of a complaint with the SDHR constituted protected activity.

The defendants concede that the plaintiff's April 2003 filing of his complaint with the SDHR constitutes protected activity under Title VII and the NYHRL.  (Memorandum in Support of Defendants' Motion to Dismiss the Complaint dated March 31, 2008 at 9 n.5).[8] Additionally, it is clear that Baruch College was made aware of this complaint through Dr. Tsaganea's May 19, 2003 letter to Dr. Halper. (Tsaganea 5/19/03 Letter; Def. Memo. at 13).  The decision not to renew Dr. Tsaganea's teaching contract was also undoubtedly an adverse employment action.  "The weight of authority supports the proposition that failure to renew an employee's contract may constitute an adverse employment action."  McFarlane v. Chao, No.

---

[8] The defendants argue that my August 28, 2008 Report and Recommendation in this case, which concerned the defendants' motion to dismiss, forecloses the plaintiff's retaliation claim based on the filing of the SDHR complaint.  (Def. Memo. at 21).  In that opinion, I found that the plaintiff had set forth a valid claim of retaliation on the basis of the February Letter, but I also wrote that "[Dr.] Tsaganea clearly could not have been terminated in retaliation for filing the [SDHR] complaint" because he "filed his first complaint with the SDHR on April 8, 2003, more than a month after he was informed by the head of the department that his contract would not be renewed."  Tsaganea, 2008 WL 4054426, at *7. However, this statement was based solely on the facts alleged in the Complaint and not on the more detailed factual record that has developed during discovery.  As discussed below, it is now clear that the March Note, upon which the defendants base their assertion that the plaintiff's employment was foreclosed before he filed the SDHR complaint, is at best ambiguous.

04 Civ. 4871, 2007 WL 1017604, at *23 (S.D.N.Y. March 30, 2007); see also <u>Weissman v. Dawn Joy Fashions, Inc.</u>, 214 F.3d 224, 234 (2d Cir. 2000) (refusal to rehire plaintiff following protected activity provides basis for retaliation claim).  However, the question remains whether a "retaliatory motive" played a part in this adverse employment action.

In order to defeat a summary judgment motion, the plaintiff must show that a causal connection could have existed between his protected activity and the adverse employment action.  "The causal connection can be established . . . indirectly by showing . . . that the adverse action closely followed the protected activity." <u>Dean v. Westchester County District Attorney's Office</u>, 119 F. Supp. 2d 424, 432 (S.D.N.Y. 2000); <u>accord</u> <u>Sumner</u>, 899 F.2d at 209; <u>DeCintio v. Westchester County Medical Center</u>, 821 F.2d 111, 115 (2d Cir. 1987).  Here, the defendants concede that the plaintiff was denied a substitute position for the 2003-2004 school year shortly after notifying Baruch College that he had filed his complaint with the SDHR.  (Def. Memo. at 13; Halper Decl., ¶ 31).  They explain that "despite" the plaintiff's May 19, 2003 letter "threatening" that failure to hire him would constitute retaliation, they hired a different candidate for the substitute position.  (Def. Memo. at 13; Halper Decl., ¶ 31).  This sequence of events provides sufficient evidence of a causal connection.

However, the defendants allege that they precluded all future

24

employment of Dr. Tsaganea in March 2003, before the plaintiff
filed his complaint with the SDHR.  (Def. Memo. at 12, 23; Halper
Decl., ¶ 28).  They assert that the March Note "informed the
plaintiff that Baruch College would no longer need his services as
an adjunct assistant professor" and thus foreclosed further
employment.  (Def. Memo. at 22-23).  The defendants reason that
once the plaintiff was denied this lower ranking position, "the
handwriting was on the wall" that he would not be reappointed to
the higher ranking substitute teacher slot.  (Def. Memo. at 23).
The plaintiff, on the other hand, argues that the March Note
indicated that there were no teaching positions available at the
time but did not prevent him from being to be hired in the future.
(Pl. Response at 48).  Indeed, Dr. Halper admits that a substitute
teaching position opened up after Dr. Ripsman declined the offer
for the tenure-track position in May 2003, and he implies that he
considered Dr. Tsaganea for that position.  (Halper Decl., ¶ 25).
Specifically, Dr. Halper explained that he was "disinclined" to
offer the plaintiff the position because he was "unhappy" with the
plaintiff's performance as a substitute during the previous year.
(Halper Decl., ¶¶ 25-27).

    In further support of his characterization of the March Note,
Dr. Tsaganea asserts that in late May or early June of 2003, Dr.
Halper offered him an adjunct position teaching American
Government.  (Pl. Response at 31).  While Dr. Halper admits to

25

offering Dr. Tsaganea such a position, he contends that this offer was made prior to the March Note.  (Halper Decl., ¶ 28).  These factual disputes relating to the timing and meaning of the March Note are further grounds for denying summary judgment.

Dr. Tsaganea argues that even if the March Note precluded further employment, he had previously engaged in protected activity when he wrote the February Letter to CUNY's Chancellor.  (Pl. Response at 6).  To demonstrate that he has engaged in protected activity, a plaintiff need only have "taken, or threatened to take, some action to protest or oppose illegal discrimination." Correa v. Mana Products, Inc., 550 F. Supp. 2d 319, 327 (E.D.N.Y. 2008). Protected activities can include "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Sumner, 899 F.2d at 209.

Whether the February letter falls within the scope of protected activity is a close question.  Although "courts construe the 'protected activity' language liberally, there must be some form of [] indicia of a complaint made against an unlawful activity." Moran v. Fashion Institute of Technology, No. 00 Civ. 1275, 2002 WL 31288272, at *8 (S.D.N.Y. Oct. 7, 2002).

On one hand, the letter focuses on the differences between the

plaintiff's political views and those of his colleagues. Thus, it is quite possible that the illegality of which he complained concerned his rights under the First Amendment rather than those under Title VII. See Williams v. Home Depot U.S.A., Inc., No. 02 Civ. 5353, 2005 WL 2429421, at *15 (S.D.N.Y. Sept. 30, 2005) (plaintiff's complaint to employer's "Alert Line" not considered protected activity because plaintiff did not allege form of discrimination prohibited by Title VII). Furthermore, although the plaintiff's letter to Chancellor Goldstein alleges "illegal" and "flagrant job discrimination," it does not specify the purported basis for the discrimination -- that is, whether it was based on national origin, religion, or some other protected classification. (Tsaganea 2/17/03 Letter).

On the other hand, the plaintiff alleged in his letter that CUNY's decision not to interview him for the tenure-track position constituted "illegal" discrimination. (Tsaganea 2/17/03 Letter at 4). See Correa, 550 F. Supp. 2d at 327. Additionally, the fact that the Chancellor's office initiated an investigation by CUNY's Affirmative Action Officer may indicate that CUNY understood his letter to be a grievance about unlawful discrimination. See Germany v. New York State Department of Correctional Services, No. 03 Civ. 148, 2005 WL 2036027, at *3, *18 (S.D.N.Y. Aug. 17, 2005) (plaintiff's internal complaint mentioning "unprofessional behavior," retaliation, and harassment, without alleging racial

discrimination, regarded as protected speech because it was forwarded to "Diversity Management" office). Because the record is unclear as to whether the Affirmative Action Officer only investigates complaints that the university believes to allege violations of Title VII as opposed to some broader category of complaints, the significance of the February Letter raises factual issues that cannot be decided on summary judgment.

## Conclusion

For the reasons set forth above, the defendants' motion for summary judgment should be granted with respect to the plaintiff's discrimination claims and denied with respect to his retaliation claim. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, Room 2510, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

28

Dated: New York, New York
      January 27, 2010

Copies mailed this date:

Dr. Doru Tsaganea
19 Vermilyea Avenue
Apt. 3B
New York, New York 10034

Clement J. Colucci, Esq.
Assistant Attorney General
120 Broadway
New York, New York 10271